## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRUSTMARK SERVICES COMPANY | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 20-3686 |
| MICHAEL FEENEY | | |

## MEMORANDUM

Presently before the Court are the Motion of Trustmark Services Company ("Plaintiff" or "Trustmark") for Summary Judgment (ECF No. 23) and Defendant Michael Feeney's ("Defendant" or "Feeney") Motion for Judgment on the Pleadings (ECF No. 24). This dispute concerns the respective obligations of a former employer, Trustmark, and employee, Feeney, after Feeney stopped working at Trustmark in the beginning of 2020. Trustmark contends that under the terms of his annual compensation agreements, Feeney owes Trustmark money that was advanced to him, totaling $269,006.00. The company asserts breach of contract, promissory estoppel, and unjust enrichment claims. Feeney maintains that Trustmark owes him a bonus in the amount of $18,979.00 and alleges that Trustmark violated the Pennsylvania Wage Payment and Collection Law, 43 P.S. 260.1, *et seq* ("PWPCL"). Trustmark's Motion will be granted, and Feeney's Motion will be denied.

## I.      BACKGROUND

Trustmark is an insurance company that provides life, accident, critical accident, and disability insurance, among other services. (Compl., ECF No. 1, ¶¶ 1-3.) Feeney worked at Trustmark as a Sales Representative from October 2010 to 2016, and as a Regional Sales

1

Manager from October 2016 to January 2020, in its Voluntary Benefit Solutions division

("VBS").  (Feeney Dep. Tr., Ex. 1, ECF No 23-2, 15:4-16:4, 21:14-22:18.)

This dispute concerns Feeney's compensation under his 2017, 2018, and 2019

compensation agreements with Trustmark.  Each year, Feeney negotiated and signed

compensation agreements with Trustmark, which specified his compensation for that year.

(Feeney Dep. Tr., 28:16-24.)  Feeney's sales goals were articulated in annual Sales Incentive

Compensation Plans ("SIC Plans").  (*Id*., 33:1-34:19.)  Feeney also signed a Monthly Sales

Incentive Compensation Advance Plan ("Advance Plan") each year, which set monthly advances

("Advances") from Trustmark based on a percentage of his projected sales volume for that year

as set forth in the SIC Plans.  (*Id*., 33:15-25; 42:21-44:4.)  Feeney was not required to receive

Advances through the Advance Plans, and he could have elected to receive a base salary and

commissions based on work he completed instead.  (*Id*., 85:19-87:4.)

At his deposition in connection with this litigation, Feeney acknowledged receiving

Advances in accordance with the compensation structure articulated in the SIC and Advance

Plans and understanding that the Advances were based upon projected commissions for work not

yet performed and were separate from his salary.  (*Id*., 32:16-25, 45:20-46:21, 50:25-54:5.)

Feeney acknowledged that he received all of the Advances contemplated in his 2017, 2018, and

2019 SIC and Advance Plans, which totaled more than $400,000.00.  (*Id*., 151:1-16.)  Feeney

also acknowledged receiving, reviewing, and signing his SIC Plans and Advance Plans for 2017,

2018, and 2019.  (*Id*., 37:20-38:5, 39:2-41:4, 40:25-41:10, 42:2-5, 42:21-44:12, 44:14-20,

45:1-46:7, 49:8-14, 66:2-67:6, 69:13-70:10, 70:22-71:1, 77:3-9; 78:22-79:3, 81:5-20, 83:24-84:7;

2017 SIC Plan, Ex. 2, ECF No. 23-2; Dec. 15, 2016, Email from S. Tickner to M. Feeney, Ex. 3,

ECF No. 23-2; 2017 Advance Plan, Ex. 4, ECF No. 23-2; 2018 SIC Plan, Ex. 5, ECF No. 23-2;

2018 Advance Plan, Ex. 6, ECF No. 23-2; 2019 SIC Plan, Ex. 7, ECF No. 23-2; 2019 Advance

Plan, Ex. 8, ECF No. 23-2.)

Under Feeney's Advance Plan in 2017, Feeney received an Advance of $15,703.13 each

month against his Sales Incentive Compensation ("SIC"). (2017 Monthly Sales Incentive

Compensation Advance Plan at 1; *see also* Feeney Dep. Tr., 49:16-50:1, 73:2-16.) Feeney could

have elected a lower Advance and had until February 3, 2017, to do so. (*Id*., 50:25-54:5; 2017

Advance Plan, ¶ 4.) The 2017 Advance Plan states that:

> This document contains the terms of the Monthly Sales Incentive Compensation Advance
> Plan ("Plan") for Trustmark Insurance Company's Voluntary Benefit Solutions Division
> ("VBS" or the "Company") and is an extension of the VBS Sales Incentive
> Compensation Plan for the current calendar year. This Plan provides RSD with the
> structure for / payment of a monthly advance against his/her Sales Incentive
> Compensation "SIC".

(2017 Advance Plan at 1.) "RSD" stands for "Regional Sales Director." (Feeney Dep. Tr.,

50:10-11.)

The VBS SIC Plan sets forth the commissions Feeney could earn. Feeney had to sign

and return the document to the Vice President of Sales and Marketing to acknowledge "receipt,

understanding, and acceptance of its terms." (2017 SIC Plan at 2.)

The Advance Plan articulates an employee's obligations to Trustmark if they have an

outstanding deficit balance:

> If, at the end of the Term or if RSD is no longer employed by the Company for any
> reason, RSD has an outstanding deficit balance of Monthly Advance received versus
> accumulated SIC earned ("Repayment Amount"), RSD agrees to write a check payable to
> Trustmark Insurance Company for the balance of the Repayment Amount within 30 days
> of termination. A payment plan can be requested and is subject to VBS approval in terms
> of its repayment amount and duration.

3

RSD will be responsible for repaying the Repayment Amount using one or more of the following options at the discretion of VBS management:

a)        Deduct an amount determined by VBS from future Sales Incentive payments;

b)        Deduct an amount determined by VBS from future regular pay dates;

c)        Deduct any remaining amount from any other amount payable to RSD;

d)        RSD writes a check to VBS for the deficit amount.

By signing below and in accordance with applicable law, RSD authorizes VBS to deduct any Repayment Amount owed to VBS.

At the discretion of VBS management, the length of the repayment period may be extended as long as necessary while RSD is employed by Company until RSD pays the entire Repayment Amount to VBS.

(*Id.*, ¶ 6.)  The Advance Plan gave Trustmark discretion to extend, change, or discontinue the

Plan:

VBS reserves the right to review RSD's projected sales in relation to the terms of this Plan on a quarterly basis.  In the event that an RSD's full year sales forecast indicates a deficit between total annual Monthly Advances scheduled to be paid and actual SIC accumulated thus far, VBS has the unilateral right to adjust the Monthly Advance amount prospectively to align with RSD's projected earned SIC.

(*Id.*, ¶ 5.)

VBS will review this Plan after December 1, 2017 to determine if extending the Plan to the following calendar year is appropriate.  This determination shall be made at the full discretion of VBS and VBS has no obligation to expand the Plan further than the Term.  Additionally, VBS has the unilateral right to change or discontinue this Plan at any time in its sole discretion, with or without cause, and with or without notice.

(*Id.* at 3.)

In fact, Trustmark reviewed the advance compensation program "every month . . . to see

what has been paid, what the potential balance would be," according to Scott Tickner, Assistant

Vice President of Sales Operations at Trustmark.  (Tickner Dep. Tr., ECF No. 28, 5:3-4, 14:3-

14.)  "And then [Trustmark] compare[d the advances] to . . . the sales rep's pipeline [to] track to see what kind of activity they have.  And if they don't have any activity, then [Trustmark] would stop the [advance compensation] program," although Trustmark was mindful that "the sales cycle . . . could take some time."  (*Id.*, 14:14-22.)

Feeney testified that he understood that if he did not meet his sales goals for that year, he would be asked to "give that money back to Trustmark," referring to his Advances, and acknowledged that one way to repay Trustmark under the Advance Plan would be to deduct money from future incentive payments or his regular pay.  (Feeney Dep. Tr., 56:9-57:15, 60:23-62:6.)

In the "Employment At Will" section, the Advance Plan specifies that Feeney's employment is at-will: "The Plan does not create an employment contract or any other contract between VBS [Voluntary Benefit Solutions] and RSD [Feeney].  RSD's employment is at-will. Either party may terminate RSD's employment for any reason, with or without cause, and with or without notice."  (2017 Advance Plan at 2.)

The Advance Plan includes a "Governing Law" section, which states that the agreement "is governed by the laws of the State of Illinois" and that "RSD understands and acknowledges that the Federal and State Courts of the State of Illinois shall be the exclusive venue for any proceedings brought pursuant to this Plan."  (*Id.* at 3.)  The Advance Plan closes by stating: "This Agreement requires RSD's signature on the attached Employment Agreement in exchange for this consideration."  (*Id.*)  Feeney and Daniel Johnson, a Vice President of Sales, signed and dated the document.  (*Id.*)

Under Feeney's 2018 Advance Plan, he received a monthly Advance against his SIC in

the amount of $14,659.38.  (2018 Advance Plan at 1.)  Like Feeney's 2017 Advance Plan, the

2018 Advance Plan allowed Feeney to elect a lower Advance and required him to repay his

balance if he left Trustmark with a deficit.  (Feeney Dep. Tr., 71:11-14, 73:7-75:10; 2018

Advance Plan, ¶ 5.)  The 2018 Advance Plan includes nearly identical provisions as the sections

excerpted above from the 2017 Advance Plan, and Feeney and Johnson signed the document.

(2018 Advance Plan, ¶¶ 6-7 and at 3.)  Feeney testified that he believed that he ended 2018 with

a deficit.  (Feeney Dep. Tr., 75:11-76:4.)

          In 2019, Feeney received a monthly Advance of $7,964.00, and he understood that he had

already accumulated a sales deficit of approximately $200,000 when he signed the 2019

Advance Plan.  (*Id.*, 89:21-90:4, 93:11-19.)  Like in 2017 and 2018, Feeney understood that

participation in the 2019 Advance Plan was optional and that the plan would require him to repay

any deficit that accrued.  (*Id.*, 86:2-9, 95:17-98:7.)  Feeney had a deficit of sales by the 2019

year-end.  (2019 Advance Plan at 1; Feeney Dep. Tr., 103:14-104:17.)  The 2019 Advance Plan

includes nearly identical provisions as the sections excerpted above from the 2017 Advance Plan,

and Feeney signed the document.  (2019 Advance Plan, ¶¶ 7-8 and at 2-3.)

          Feeney was aware that he had a deficit when he left Trustmark in the beginning of 2020.

(Feeney Dep. Tr., 60:23-63:3, *see also* 75:11-77:12, 103:14-104:19.)  Feeney received monthly

statements from Trustmark by email listing his accumulated deficit, and a September 2019

statement noted that his total deficit was $225,447.00.  (*Id.*, 111:11-114:25, 115:13-17; RSD

Sales Incentive Compensation Summary, Ex. 9, ECF No. 23-2, at 1.)  Trustmark used a bonus

Feeney was set to receive in 2019 to pay down a portion of the deficit, and Feeney was not told

in advance that the bonus would be used to repay the deficit.  (Feeney Dep. Tr., 119:21-120:7,

121:2-122:4.)

Feeney's last day of employment at Trustmark was January 10, 2020.  (Jan. 22, 2000, Ltr. from J. Waldie to M. Feeney, Ex. 10, ECF No. 23-2.)  He received a letter from Jack Waldie, a Regional Sales Vice President at Trustmark, dated January 22, 2020, which stated that his outstanding deficit as of the date of Feeney's termination was $269,006.00 and requested payment.  (Feeney Dep. Tr., 134:9-24; Jan. 22, 2000 Ltr. from J. Waldie to M. Feeney.)  Feeney thought that it was "insane" that Trustmark would expect him to repay the deficit.  (Feeney Dep. Tr., 136:12-15, *see also* 136:16-138:14.)  Feeney denies that he owes Trustmark any money. (Answer, ECF No. 7, ¶¶ 6, 11, 36.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248).  "[A] factual dispute is material only if it might affect the outcome of the suit under governing law."  *Id.*  The court must view the evidence in the light most favorable to the non-moving party.  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir.

2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

A party may move for judgment on the pleadings under Rule 12(c) "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  To succeed on a motion under Rule 12(c), the movant must clearly establish that no genuine issues of material fact remain and that "he is entitled to judgment as a matter of law."  *Damron v. Smith*, 616 F. Supp. 424, 425 (E.D. Pa. 1985).  When deciding a motion for judgment on the pleadings, the court must view the pleadings in the light most favorable to the non-moving party and grant the motion only if it is beyond doubt that the non-movant can plead and prove no facts that would support his claim for relief.  *Constitution Bank v. DiMarco*, 815 F. Supp. 154, 157 (E.D. Pa. 1993).  "Rule 12(b)(6) motions to dismiss and Rule 12(c) motions for judgment on the pleadings for failure to state a claim are judged according to the same standard."  *Gebhart v. Steffen*, 574 F. App'x 156, 158 (3d Cir. 2014).

## III.   DISCUSSION

Trustmark moved for summary judgment on its breach of contract claim and Feeney's counterclaim.  (Trustmark Mem. of Law ISO Mot. for Summary Judgment ("Trustmark MSJ"),

ECF No. 23-1, at 11 (ECF pagination).)  Feeney moved for judgment on the pleadings on

Trustmark's claims and its counterclaim.  (Feeney Mem. of Law ISO Mot. for Judgment on the

Pleadings ("Feeney MJP"), ECF No. 24, at 3 (ECF pagination).)

A.     **Breach of Contract**

1.     *The Parties' Arguments*

Trustmark argues that it has established its breach of contract claim in the amount of

$269,006.00 and that there no issues of material fact.  (Trustmark MSJ at 8, 14.)

Feeney challenges the Advance Plans by relying on different principles of contract

interpretation.  First, he maintains that the Advance Plans are ambiguous and may be interpreted

in at least two ways.  (Opp'n to Trustmark MSJ, ECF No. 28, at 6-7 (ECF pagination).)  Feeney

does not articulate in what ways the Advance Plans are ambiguous or provide an alternative

explanation (*see* Reply Br., ECF No. 29, at 5 (ECF pagination)) and instead claims that "[a]ll that

is needed is for the Court to conclude that the clauses can be read in more than one way" to

interpret the Advances Plans in favor of Feeney.  (Opp'n to Trustmark MSJ at 6-7.)  Feeney

argues that we should analyze extrinsic evidence to interpret the agreement, and, in particular,

should consider that Trustmark exercised its discretion to suspend advanced compensation for

other employees but did not exercise this discretion with respect to Feeney or terminate Feeney's

Advances under his Advance Plans.  (*Id*. at 7.)

Feeney maintains that the "Employment At Will" section in the Advance Plans stating

that the Plan "does not create an employment contract or any other contract between" Trustmark

and Feeney (2017 Advance Plan at 2; 2018 Advance Plan at 2; 2019 Advance Plan at 2) "was

intended to alleviate Trustmark f[ro]m contractual liability" and "the same legal protection

9

should be extended to Feeney." (Opp'n to Trustmark MSJ at 8.) Therefore, Trustmark's breach of contract claim fails because the Advance Plans explicitly state that they do not create an employment contract or any other contract between Feeney and Trustmark. (Feeney MJP at 6.) Feeney contends that the doctrine of *contra proferentem* counsels interpreting this clause against Trustmark. (*Id*.) Feeney also argues that clauses in the Advance Plans allowing Trustmark to seek repayment from him render the agreements "illusory" and lacking consideration. (*Id*. at 9-10.)

Feeney further maintains that Trustmark is barred from seeking equitable relief by the doctrines of waiver estoppel, laches, and release. (Feeney MJP at 8.) Under the Advance Plans, Trustmark retained the right to review on a quarterly basis Feeney's SIC in relation to his Advances. (*Id*.) Trustmark had broad discretion to modify the Advances, cease paying them altogether, or to request repayment for any deficit at the conclusion of the applicable term if it discovered a deficit. (*Id*.) Trustmark never took such actions and instead renewed the Advance Plan at the end of each term at issue. (*Id.*) As such, Feeney argues that Trustmark has waived its right to seek repayment now, "especially where Trustmark's actions are motivated by retaliation for Feeney's resignation." (*Id*.) Feeney also contends that Trustmark has not stated a claim for promissory estoppel or unjust enrichment. (*Id*. at 7.) Feeney asserted these challenges as Affirmative Defenses in his Answer to the Complaint, and Trustmark has not answered or otherwise responded to them. (*Id*.)

In response, Trustmark maintains that the Advance Plans are not ambiguous because they set forth Feeney's obligation to repay Trustmark in the event his earned sales incentive compensation was less than the Advances he received under the 2017, 2018, and 2019 Advance

Plans.  (Reply Br., ECF No. 29, at 3-5 (ECF pagination).)  Feeney's deposition testimony undermines his argument that the Advance Plans are ambiguous: Feeney testified that the Advance Plans were contracts and that he understood their terms, including his obligation to repay Advances that he did not earn in commission.  (*Id*. at 6-8.)

Trustmark also counters that the "Employment At Will" section of the Advance Plans is not ambiguous: it makes clear that Feeney's employment is at-will and that the Advance Plans "do[] not create an obligation for Trustmark to continue to employ Feeney or for Feeney to remain at Trustmark for a certain time period."  (*Id*. at 6.)  Trustmark contends that the employment-at-will section does not "negate the terms and conditions governing Feeney's repayment obligations under the Advance Plan[s]."  (Opp'n to Feeney MJP, ECF No. 27, at 4, *see also* 7-11 (ECF pagination).)  In its view, compensation terms and conditions, even when appearing with an express disclaimer of an at-will employment, are still contracts.  (*Id*. at 9.)

In addition, Trustmark maintains that Feeney is not entitled to judgment on the pleadings merely because Trustmark did not respond to or contest his affirmative defenses.  (*Id*. at 4.)  According to the company, "[t]here is absolutely no requirement that a party oppose or otherwise respond to affirmative defenses raised by the other party," as Federal Rule of Civil Procedure 8 only requires that affirmative defenses be affirmatively stated in response to a pleading.  (*Id*. at 7-8.)

    2.    *Trustmark is Entitled to Repayment under the Advance Plans*

Under Pennsylvania law, a breach of contract claim includes three elements: "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the

contract; and (3) resultant damage."[1] *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 580 (Pa Super. Ct. 2003).

"The formation of a valid contract requires the mutual assent of the contracting parties." *Degenhardt v. Dillon Co.*, 669 A.2d 946, 950 (Pa. 1996). "An express contract is formed when the terms of an agreement are declared by the parties either verbally or in writing." *McGough v. Broadwing Commc'ns, Inc.*, 177 F. Supp. 2d 289, 296 (D.N.J. 2001) (applying Pennsylvania law). "When interpreting a contract, a court must determine the intent of the parties and effect must be given to all provisions in the contract." *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993) (citation omitted). "[T]he intent of the parties to a written contract is contained in the writing itself." *Krizovensky*, 624 A.2d at 642.

"[A]greements will be construed against the drafter only when the terms are ambiguous." *Banks Eng'g Co., Inc. v. Polons*, 697 A.2d 1020, 1023 (Pa. Super. Ct. 1997). A contract is "ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (citation omitted) (applying Pennsylvania law). "A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 93. "[T]he mere fact that the parties do not

---

[1] Trustmark and Feeney both apply Pennsylvania and Third Circuit law, even though the Advance Plans specify that Illinois state law governs. But Pennsylvania and Illinois law are not in conflict regarding breach of contract claims. *Zurich Am. Ins. Co. of Illinois v. Sunshine Trucking, LLC*, No. 20-4481, 2021 WL 860413, at *2 n.1 (E.D. Pa. Mar. 8, 2021). Pennsylvania and Illinois law regarding the at-will status of employment contracts are virtually identical. *Permenter v. Crown Cork & Seal Co., Inc.*, 38 F. Supp. 2d 372, 376 (E.D. Pa. 1999). Accordingly, we will apply Pennsylvania law.

agree on the proper construction" does not render a contract ambiguous.  *Id*.  "To determine whether ambiguity exists in a contract, the court may consider 'the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'"  *Id*. (citation omitted).  "When the language of a contract is clear and unequivocal, courts interpret its meaning by its content alone, within the four corners of the documents."  *Banks Eng'g Co., Inc.*, 697 A.2d at 1023 (citation omitted).

The parties' dispute on the enforceability of the Advance Plans turns on how to construe the "Employment At Will" section of the Advance Plans, which, in relevant part, states that: "The Plan does not create an employment contract or any other contract between [Trustmark] and [an employee]."  (2017 Advance Plan at 2; 2018 Advance Plan at 2; 2019 Advance Plan at 2).  Under Trustmark's interpretation, this section "only confirm[s] that Feeney's employment was at-will" (Opp'n to Feeney MJP at 4, 7-11) and does not "create an obligation for Trustmark to continue to employ Feeney or for Feeney to remain at Trustmark for a certain time period." (Reply Br. at 6.)  This section does not "negate the terms and conditions governing Feeney's repayment obligations under the Advance Plan[s]."  (Opp'n to Feeney MJP at 4.)  In contrast, Feeney maintains that because the section states that "the Plan does not create an employment contract or any other contract," this section "was intended to alleviate Trustmark f[ro]m contractual liability" and "the same legal protection should be extended to Feeney."  (Opp'n to Trustmark MSJ at 8.)

We are satisfied that the Advance Plans are valid contracts and reflect the mutual assent of the contracting parties.  The "Employment At Will" section is not ambiguous: only Trustmark's interpretation aligns with the concept of at-will employment and contract principles.

It is well-established that at-will employment "addresses a particular aspect of the employment relationship—the ability of both employer and employee to terminate their employment relationship at any time without explanation or cause." *McGough*, 177 F. Supp. 2d at 296. "The doctrine does not, however, address other aspects of the employment arrangement, such as issues regarding the promised form and amount of compensation for work completed prior to an employee's termination." *Id*. "[T]he doctrine does not relieve . . . contractual obligation[s] to provide the compensation promised." *Id*. In other words, an employee's "status as an at-will employee is irrelevant to whether a contract existed to provide compensation during the terms of his employment." *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 716 (Pa. Super. Ct. 2005) (involving an at-will employee asserting breach of contract claims based on a Compensation Agreement and a Severance Agreement). These principles support Trustmark's position that the "Employment At Will" section should be interpreted as making clear that the compensation plan does not affect or change Feeney's status as an at-will employee.

Feeney's position that the "Employment At Will" section of the Advance Plans nullifies all legal obligations of the parties and renders the documents not contracts would lead to a preposterous result. It would render the advance compensation scheme completely unenforceable by either party. The parties could not have intended this result for multiple reasons. The Advance Plans include a choice of law provision, and Feeney signed that he "understands and acknowledges" that Illinois state and federal courts are the exclusive venue for any proceeding brought under the Plan.[2] It would not be logical for a document that lacked legal

---

[2] Despite this venue provision in the Advance Plans, in asserting its counterclaim, Feeney stated that venue is proper in this district because he resides in this district and Trustmark initiated the action in this Court. (Answer at 13.)

enforcement to include a choice of law and venue provision.  In addition, the Advance Plans are an extension of the SIC Plans, which lay out the commissions Feeney can earn and require his signature to acknowledge his acceptance of the terms.  Feeney's position would then mean that Feeney's commission agreement also lacked legal force.  Furthermore, Trustmark performed under the Advance Plans and paid Feeney Advances totaling more than $400,000 for approximately three years, and the Advance Plans outline what each party agrees to do in the event of a deficit or surplus.  Feeney's signature is required in "exchange for this consideration." (2017 Advance Plans at 3; 2018 Advance Plans at 2; 2019 Advance Plans at 3.)  Feeney's position would render these provisions completely voluntary and unenforceable.

Feeney's interpretation would be counter to established principles of contract interpretation because "a court should attempt to construe a contract so as to give effect to all of its provisions."  *Altman v. Nationwide Life Ins. Co.*, No. 98-3395, 1999 WL 269938, at *3 n.3 (E.D. Pa. Apr. 23, 1999).  A court must "construe [a] contract so that no provision is rendered meaningless."  *Warren Hill, LLC v. SFR Equities,* LLC, No. 18-1228, 2019 WL 3304693, at *5 (E.D. Pa. July 23, 2019).  Feeney has offered no support to buttress his statement that the "Employment At Will" section was "intended to alleviate Trustmark f[ro]m contractual liability" (*see* Opp'n to Trustmark MSJ at 8), especially when the Advance Plans impose obligations on Trustmark as well, such as paying Advances as prescribed under the Plans and paying a covered employee a surplus balance if applicable.

As a result, Trustmark is entitled to relief on its breach of contract claim: the Advance Plans are valid contracts, and they stipulate that Feeney agrees to pay Trustmark his outstanding deficit balance if his Advances were greater than the commission he earned.  Trustmark notified

Feeney that he owed his former employer approximately $269,006.00.  The parties do not

dispute that Feeney has not paid the money back, and Trustmark has been damaged because

Feeney has not performed under the agreements.[3]

Enforcing the Advance Plans and requiring Feeney to repay his deficit is supported by

Pennsylvania precedents.  The case of *Banks Engineering Co., Inc.* involved a sales

representative who was primarily compensated on commission but received a "draw against

commission."  697 A.2d at 1021.  His agreement with the company stated: "It is understood that

this draw is a non-interest loan and is to be paid back by commissions earned or by other means.

In the event of termination of this contract any and all outstanding draw amounts will become

due within ninety days."  *Id*. at 1022.  When the sales representative terminated his employment,

the company had paid approximately $30,000.00 in draws above commission earned, and under

the language of the parties' agreement, the Superior Court affirmed that the company was

entitled to repayment.  *Id*. at 1023.  *See also Snellenberg Clothing Co. v. Levitt*, 127 A. 309, 310

(Pa. 1925) (interpreting a contract that stated that advances were to apply against and be

deducted from an employee's earnings and finding that without a provision to the contrary, the

Court was "constrained to treat the advances strictly as such and require return of any excess.")

---

[3]  Feeney asserts in a conclusory fashion in his Motion for Judgment on the Pleadings that
Affirmative Defenses he raised in his Answer to the Complaint defeat Trustmark's claims and support his
counterclaim.  (Feeney MJP at 8.)  However, these boilerplate defenses have not been developed at
summary judgment and, as a result, are not properly before the Court.  *See, e.g.*, *In re Fraction*, 622 B.R.
642, 645 n.3 (E.D. Pa. 2020) (excluding "boilerplate defenses that were not developed at summary
judgment"); *Noramco LLC v. Dishman USA, Inc.*, No. 21-1696, 2023 WL 1765566, at *3 (D. Del. Feb. 3,
2023) ("Although it is true that [the defendant] raised that defense in its answer, [their] failure to raise that
defense at the summary judgment stage results in a forfeiture of that defense."); *Arrowood Indem. Co. v.
Metallo Gasket Co.*, No. 09-4814, 2011 WL 5416408, at *4 (D.N.J. Nov. 4, 2011) (finding that
affirmative defenses included in an opposition on summary judgment were not properly before the Court
when they were not asserted in a cross-motion seeking affirmative relief).

Accordingly, we grant Trustmark's Motion and deny Feeney's Motion with respect to Trustmark's breach of contract claim.[4]

   **B.    Pennsylvania Wage Payment and Collection Law**

Feeney argues that he is entitled to a bonus of $18,979.00 that he claims was applied against his deficit in violation of the PWPCL.  (Answer at 13-16.)  Trustmark maintains that Feeney's counterclaim fails because he has no contractual entitlement to the bonus that was used to offset the outstanding deficit balance he owed Trustmark.  (Trustmark MSJ at 17-18.)  Trustmark contends that it properly offset the bonus against the money Feeney owed Trustmark in accordance with the terms of the Advance Plans.  (*Id*. at 18.)  Feeney moves for judgment on the pleadings on his counterclaim (Feeney MJP at 1), but he does not address his entitlement to the bonus in support of his Motion or in opposition to Trustmark's Motion.

The PWPCL "provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages." *Oxner v. Cliveden Nursing & Rehab. Ctr. PA, L.P.*, 132 F. Supp. 3d 645, 649 (E.D. Pa. 2015).   The law "does not create an employee's substantive right to compensation; rather it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." *Banks Eng'g Co., Inc.*, 697 A.2d at 1024.  "The contract between the parties governs in determining whether specific wages are earned." *Oxner*, 132 F. Supp. 3d at 649.

As analyzed above, the Advance Plans are valid contracts.  The Advance Plans provide that if an employee has "an outstanding deficit balance of Monthly Advance received versus accumulated SIC earned ('Repayment Amount')," the employee "will be responsible for

---

[4] Granting Trustmark's Motion renders its promissory estoppel and unjust enrichment claims moot.  Accordingly, we will not address these claims.

repaying the Repayment Amount using one or more of the following options at the discretion of VBS management." (2017 Advance Plan, ¶ 6; 2018 Advance Plan, ¶ 7; 2019 Advance Plan, ¶ 8.)  The parties do not dispute that Trustmark had a deficit when he left Trustmark and that the deficit exceeded the $18,979.00 bonus.  (*See* Feeney Dep. Tr., 60:23-63:3, 75:11-77:12, 103:14-104:19, 134:9-24; Jan. 22, 2000, Ltr. from J. Waldie to M. Feeney.)  The Advance Plans specify four ways to repay the Repayment Amount, including by "deduct[ing] an amount determined by VBS from future Sales Incentive payments" and by "deducting[ing] any remaining amount from any other amount payable to" the employee, which includes a bonus.  (2017 Advance Plan, ¶ 6; 2018 Advance Plan, ¶ 7; 2019 Advance Plan, ¶ 8.)  The Advance Plans further state that "by signing below and in accordance with the applicable law, RSD authorizes VBS to deduct any Repayment Amount owed to VBS."  (*Id*.)  Under the Advance Plans, the RSD "agrees" to pay Trustmark the balance of the Repayment Amount. (*Id*.)  Therefore, under this contractual scheme, Trustmark was authorized to offset the Repayment Amount with Feeney's bonus, and Feeney has provided no support to the contrary.  Accordingly, Trustmark's Motion is granted, and Feeney's Motion is denied with respect to Feeney's PWPCL counterclaim.

## IV.    CONCLUSION

For the foregoing reasons, Trustmark's Motion is granted, and Feeney's Motion is denied.  The Clerk of Court is directed to mark this matter as closed.  An appropriate Order follows.

BY THE COURT:

*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**

18